**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| CRAIG REULBACH, on behalf of himself and all others similarly situated, ) | CASE NO. 21-cv-01013 |
| ) | JUDGE PATRICIA A. GAUGHAN |
| *Plaintiff*, ) | |
| ) | |
| vs. ) | |
| ) | |
| LIFE TIME FITNESS, INC., *et al.,* ) | |
| ) | |
| *Defendants.* ) | |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO COMPEL ARBITRATION, TO STAY PROCEEDINGS AND FOR ATTORNEYS' FEES

In his Opposition to Defendants' Motion to Compel Arbitration ("Response"), Plaintiff Craig Reulbach ("Plaintiff" or "Reulbach") spends an inordinate amount of time arguing against a "reasonable notice" standard Defendants briefly addressed in a footnote, conveniently omitting any mention of the fact that **he affirmatively acknowledged receipt of the arbitration agreement at issue in this case**. As shown in Defendants' Motion to Compel Arbitration, to Stay Proceedings and for Attorney's Fees ("Motion") and explained in more detail below, Reulbach received "actual notice" of the arbitration agreement, to which he bound himself by failing to opt out as required. And because of the broad scope of the agreement and lack of express provisions excluding any of his causes of action, all of Reulbach's claims are subject to arbitration.

**A. Reulbach Affirmatively Acknowledged Receiving Actual Notice of the Arbitration Agreement.**

Reulbach would have this Court believe that proving "actual notice" of an arbitration agreement under Ohio law requires nothing short of evidence of a wet signature on a paper contract. But that is not the case. In Ohio, actual notice simply means that a party has actual knowledge of a subject. *Sandor v. GE*, No. 16-CV-1670, 2016 U.S. Dist. LEXIS 161827, at *5

n.30 (N.D. Ohio Nov. 22, 2016) (citing *Jones v. Carrols*, 2015-Ohio-2250 (Ct. App.)).[1] And here, Reulbach's claim that he did not receive actual notice of the arbitration agreement, supported by nothing more than his own self-serving declaration testimony, is blatantly and demonstrably false and, thus, cannot create a genuine issue of material fact as to the validity of the agreement to arbitrate. *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002) (to withstand a motion to compel arbitration, "the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate . . . [a] showing [which] mirrors that required to withstand summary judgment"); *Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020) ("[W]here self-serving testimony is blatantly and demonstrably false, it understandably may not create a *genuine* issue of material fact, thereby allowing a court to grant summary judgment.") (citing *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (holding that a court, when determining whether a genuine dispute of material fact exists in a case, may ignore testimonial evidence when it is "blatantly contradicted" by video evidence)); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 419 (6th Cir. 2008) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989) (assuming as true on summary judgment the nonmoving party's version of events unless that version is "totally implausible")).

Perhaps Reulbach's most demonstrably false and implausible claim is that he "never saw

---

[1] Though actual notice exists in this case, Defendants do not concede that Ohio or the Sixth Circuit has adopted that standard and maintain that its arbitration agreement is enforceable even absent actual notice, regardless of whether or not Reulbach acknowledged the document in his Workday profile. Notably, the Supreme Court of Ohio has yet to opine on the subject of notice required for arbitration agreements. Historically, arguments for the actual notice standard have typically relied on *Jones*, an Ohio Court of Appeals opinion, and a handful of unreported federal district court opinions, as is the case here. Other federal courts, including Sixth Circuit courts, have adopted a "reasonable notice" standard. *See, e.g. Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411 (6th Cir. 2011); *Emmanuel v. Handy Techs., Inc.*, 992 F.3d 1 (1st Cir. 2021); *Davis v. Nordstrom, Inc.*, 755 F.3d 1089 (9th Cir. 2014).

or agreed to arbitration via 'Workday'[2] as he was out of the office on Company Medical Leave recovering from double hip replacement surgery" from May 20, 2019 to August 11, 2019. While it is true Reulbach was out on leave during that timeframe, Defendants provided evidence that he agreed to arbitration via Workday on September 30, 2019, nearly two months after his return from leave.

In their Motion, Defendants showed that they electronically transmitted the arbitration agreement to Reulbach's Workday profile on June 24, 2019. Fredricks Decl., ¶ 16. In addition to providing a hyperlink to the actual arbitration agreement, the transmittal itself specifically notified team members that the only manner in which they could decline to participate in the program was to affirmatively opt out within 15 days of receipt. *Id*., ¶¶ 21-22. Absent a timely opt-out, the notification explained, team members would be covered by the arbitration agreement. *Id*. The notification, in relevant part, appeared in Reulbach's Workday profile as follows:

---

[2] As explained in Defendants' Motion, Workday is a human-resources software system Life Time uses for team member and other enterprise resource planning functions. Doc. 6-2, Fredricks Decl., ¶ 17. Every Life Time team member has an individual Workday profile and is expected to use Workday to access employment documents like paystubs, personnel information, benefit information, and communications from the company. *Id*. Timekeeping Life Time team members (like Reulbach) also use Workday to track and record their working time, or to request time off. *Id*. Team members can access Workday on the Life Time desktop computers and iPads they use while working at the facilities. *Id*. at ¶ 19. They can also access Workday using their own personal laptops and mobile devices at any time if they choose to do so. *Id*.

## Team Member Care and Mutual Arbitration Agreement

| | |
|---|---|
| Document | Team Member Care US (June 2019) |
| Instructions | Please read this important announcement regarding Team Member Care (MC), a new multi-option program Life Time has adopted for resolving Team Member disputes that includes an arbitration program. At Team Members at Life Time's clubs (outside of New Jersey) are covered by the Mutual Arbitration Agreement. Other than in Missouri, Team Members have the choice to opt out of the program within 15 days of receiving the Agreement. More information about TMC, the arbitration program and a copy of the Mutual Arbitration Agreement is enclosed in this document |
| Signature Statement | Please note that you do not need to acknowledge receipt of these documents through Workday. Whether or not you acknowledge receipt you are automatically covered by Ter Member Care (TMC) and the Mutual Arbitration Agreement (although Team Members, other than in Missouri have the choice to opt of out of the Mutual Arbitration Agreement within 15 days of receiving the Agreement). These documents are being sent through Workday so you can access information retated to TMC and the Mutual Arbitration Agreement at your convenience. |

I Agree

Fredricks Decl., ¶ 22; Declaration of Jignesh Patel ("Patel Decl."), ¶ 10.

Defendants provided evidence that, not only did Reulbach go on Workday and see the notification, he "provid[ed] his electronic signature affirmatively acknowledging his electronic receipt of the TMC Program and Mutual Arbitration Agreement on September 30, 2019." Fredricks Decl., ¶ 23. But if that evidence were not enough, given Reulbach's bald-faced denial that he logged into Workday at the time the arbitration agreement was disseminated, Defendants have now pinpointed for the Court the exact time and device from which Reulbach acknowledged receipt of the agreement, further demonstrating that Reulbach's denials are false. On September 30, 2019, Reulbach was working at the Life Time club at which he regularly worked in Beachwood, Ohio. Patel Decl., ¶ 7. According to Workday data, presumably between his two scheduled classes and personal training sessions, Reulbach logged into his Workday profile three times: twice from his personal cell phone using the Workday app (12:40 p.m. to 1:43 p.m. and 2:51 to 3:51 p.m.) and once from a desktop computer on Life Time's network at the Beachwood

4

club (2:42 p.m. to 3:49 p.m.). *Id*. at ¶ 8. To access his Workday profile from a desktop computer on Life Time's network, Reulbach would need to input his own individual employee ID number/username and password. *Id*. at ¶ 9. Nobody else would be able to log in as Reulbach unless they had his username/password and, if logging in via cell phone or non-Life Time network desktop, his actual cell phone and login credentials that are unique to his phone. *Id*. Life Time does not share Workday sign-on credentials with other team members and instructs its team members not to share them either. *Id*. While Managers do have the ability to upload documents and view team member acknowledgments via Workday, any actions they complete show their own unique team member IDs. *Id*.

At 2:48 p.m., from a desktop computer on Life Time's network, Reulbach clicked "I agree" on the notification in his Workday profile described above, which asked him to acknowledge receipt of Life Time's "Team Member Care and Mutual Arbitration Agreement." Patel Decl., ¶ 10.[3] An excerpt from Reulbach's Job Profile History (a clearer copy of which is attached to the Declaration of Jignesh Patel as **Exhibit D**) confirms his acknowledgment:

| Document | Effective Date | Document Link | Document Attachment | Signature Type | Signed By | Signature Date | Signature Statement |
|---|---|---|---|---|---|---|---|
| Team Member Care US (June 2019) | 06/24/2019 | | Team Member Care US (June 2019).pdf | Acknowledgment | Craig F Reulbach (Terminated) (92013) | 09/30/2019 02:48:13 PM | Please note that you do not need to acknowledge receipt of these documents through Workday. Whether or not you acknowledge receipt, you are automatically covered by Team Member Care (TMC) and the Mutual Arbitration Agreement (although Team Members, other than in Missouri, have the choice to opt out of the Mutual Arbitration Agreement within 15 days of receiving the Agreement). These documents are being sent through Workday so you can access information related to TMC and the Mutual Arbitration Agreement at your convenience. |

As previously mentioned, the notification specified that failure to opt out within 15 days of receipt would bind team members to the arbitration agreement. *Id*. at ¶ 11. And it is undisputed that Reulbach failed to opt out within the allotted timeframe. Fredricks Decl., ¶ 34. Other than his own

---

[3] It is clear Reulbach knew how to review documents in Workday and was well-versed in how to acknowledge them. In addition to the arbitration agreement, between his return from leave on August 12, 2019 and his resignation on February 25, 2021, Reulbach successfully acknowledged at least 20 documents in his Workday profile. Patel Decl., ¶ 12.

5

declaration testimony (given under penalty of perjury) falsely denying that he even saw the Workday notification about arbitration, Reulbach provides no evidence supporting his alleged lack of notice via the Workday platform.[4]

Undisputed evidence of Reulbach's receipt and affirmative acknowledgment of the arbitration agreement distinguishes this case from those he cites in his Response. In *Sandor*, for example, the defendant employer provided no evidence of affirmative acknowledgment and instead based its entire argument on the plaintiff's continued employment following its dissemination of information related to arbitration via email. 2016 U.S. Dist. LEXIS 161827, at *6. The court rejected the employer's argument, finding the employer's transmittal emails, which included hyperlinks to the arbitration documents, did not contain a continued employment clause. *Id*. at *6-7. Because the employer provided no evidence that the plaintiff clicked on the hyperlinks or otherwise opened any documents containing the continued employment clause, the plaintiff was

---

[4] Reulbach's claim that he "was frequently unable to access Workday at Life Time Fitness because of limited computers, the Workday platform at times being down, and slow computers" is also false. According to the data, between August 12, 2019 and February 25, 2021, Reulbach attempted to sign on to the Workday system approximately 450 times, many of which were through his personal cell phone. Patel Decl., ¶ 5. Of those attempts, only 23 failed. *Id*. Ten of those failed attempts were the result of expiration of Reulbach's mobile PIN (a security feature requiring team members to log in using their user ID/Password and set up their PINs again every 30 days that also ensures Life Time is aware of exactly who is accessing the system and when), after which he reset his PIN and successfully signed on, usually within a few minutes of his initial unsuccessful sign-on attempt. *Id*. Three of the failed attempts were the result of Reulbach inputting an invalid PIN, after which he inputted his correct PIN and signed on successfully, twice within a minute of his initial attempt. *Id*. The remaining 10 failed attempts all occurred on August 12, 2019, and were the result of Reulbach returning from leave on that day. Team members on leave are locked out of their regular Workday accounts and are only allowed limited access via a temporary password. Upon return, Life Time's Leave of Absence team needs to remove team members from a specific "Leave of Absence SAML Whitelist" security group, which then allows them to login to their regular Workday account using SAML (regular network ID/Password). As soon as the Leave of Absence team removed Reulbach from that group (which happened that same day), he was able to login to Workday. *Id*. Moreover, the Workday platform is rarely "down," as Reulbach claims, other than during regularly scheduled maintenance every Saturday morning at 1:00 a.m. Central Time, which usually lasts approximately four hours, after which access is restored. *Id*. at ¶ 4.

not actually aware that her continued employment required acceptance of the arbitration agreement and, thus, did not have actual notice. *Id*. Here, on the other hand, Reulbach affirmatively acknowledged receipt of the agreement, transmitted to him via a Workday notification that specified failure to opt out within a specific timeframe would bind him to arbitration. Despite his acknowledgment, Reulbach failed to opt out within the specified timeframe.

Similarly, in *Doerman v. Meijer, Inc.*, No. 1:17cv571, 2018 U.S. Dist. LEXIS 163773, at *10-11 (S.D. Ohio Sep. 25, 2018), the employer submitted evidence of an email with an attached copy of its amended Dispute Resolution Policy ("2004 DRP"), which it claimed to have sent to all employees with company email addresses. The court noted, however, that the "email does not specifically contain Plaintiff's email address in the recipient field, rather, it merely states 'MEIJER LIST.' There is no evidence that Plaintiff's email address was included in the 'MEIJER LIST' or that Plaintiff received the email." *Id*. "Because there is no evidence that Plaintiff signed or acknowledged receipt of the 2004 DRP or its amendments," the court held, "Plaintiff cannot be compelled to arbitrate a dispute that she has not agreed to arbitrate." *Id*. at *12.[5] Unlike *Doerman*, Defendants have provided undisputed evidence that Reulbach "acknowledged receipt" of the arbitration agreement at issue in this case, which was delivered to his individual Workday profile.

---

[5] Though he makes an issue of Defendants' citation to Sixth Circuit cases applying non-Ohio law, Reulbach also cites to *Camar v. Mastro's Restaurants LLC,* 952 F.3d 372 (D.C. Cir. 2020). In addition to being a D.C. Circuit case applying non-Ohio law, *Camar* is easily distinguishable on the facts. In that case, the employer had a practice of obtaining physical signatures from all employees on the arbitration agreement, but could not produce a copy of the plaintiff's specific signed agreement. *Id.* at 374-75. This was key to the court's decision—not under Ohio law—to affirm the underlying court's order not to compel arbitration. "The company's failure to produce an arbitration agreement containing Camara's signature after the company searched for such a document makes it more likely that no such document exists, which in turn makes it less likely that Camara agreed to arbitrate disputes." *Id.* at 375. Here, there is no "missing copy" that casts doubt on whether Reulbach received a copy of the arbitration agreement—evidence indisputably shows his receipt and affirmative acknowledgment of it.

As shown above, Reulbach had actual notice of the arbitration agreement. And by his conduct after receiving notice—failing to opt out as required—Reulbach demonstrated his agreement to be bound. *See, e.g. Legair v. Circuit City Stores, Inc.*, 213 F. App'x 436, 439 (6th Cir. 2007) (finding "plaintiff by his conduct demonstrated his agreement to be bound" because he "failed to take the required action to opt out"). Reulbach's blatantly and demonstrably false testimony denying his agreement is insufficient to show otherwise.[6] Accordingly, Reulbach can and should be compelled to arbitrate his claims in this action.[7]

---

[6] In essence, Reulbach argues that he can opt out of an otherwise valid arbitration agreement to which he previously assented merely by denying the objectively-provable fact of his assent. If Reulbach's theory is correct (which it is not), and a party to an arbitration agreement can create a disputed issue of fact through such self-serving, after-the-fact, and false testimony alone, then dispute resolution programs could only be enforced in Ohio if (a) they were physically signed or (b) employees chose not to challenge them as every employee opposing enforcement of unsigned dispute resolution programs could just deny seeing them and end the inquiry. This is not the case in Ohio or any other Sixth Circuit state, though, and dispute resolution programs like Life Time's that do not require signatures are routinely found to be valid and enforceable in the face of opposition to efforts to compel arbitration. *See, e.g. Dantz v. Apple Am. Grp. LLC*, 277 F. Supp. 2d 794, 801 (N.D. Ohio 2003) (enforcing dispute resolution program and holding "[t]here is no requirement that an arbitration agreement be signed in order to be valid and enforceable."); *McDonald v. Halliburton*, 795 F. App'x 441, 443 (6th Cir. 2020) (enforcing dispute resolution program); *Jane Doe (W.K.) v. Farrell*, 2006-Ohio-2676, ¶ 24, 167 Ohio App. 3d 14, 20, 853 N.E.2d 728, 733 (enforcing dispute resolution program and holding "there is no requirement that an arbitration agreement be signed by either party in order to be enforceable … The only requirement is that the arbitration agreement be reduced to writing."). Because, as shown above, it takes more than a mere, disprovable denial to challenge the validity of a dispute resolution program, Reulbach's theory fails.

[7] Reulbach's false denial of his Workday activities also casts significant doubt on the truthfulness of the remainder of his declaration testimony. For example, Reulbach claims he did not receive a copy of the arbitration agreement Defendants indisputably sent him via first class mail. In addition to its doubtfulness based on Reulbach's demonstrated lack of candor, Reulbach's denial of receipt is insufficient to rebut the presumption of delivery under the "mailbox rule." *In re Yoder Co.*, 758 F.2d 1114, 1118 (6th Cir. 1985) ("The common law has long recognized a presumption that an item properly mailed was received by the addressee."); *Nationstar Mortg. LLC v. Billock*, 2020-Ohio-4723, ¶ 19 (Ct. App.) (finding "only a denial" was insufficient to counter an averment that a letter was sent via first class mail). Reulbach's denial is particularly suspect given that he confirmed in his declaration the address to which Defendants correctly mailed the arbitration agreement. Supplemental Declaration of Kelley Fredricks, ¶ 6.

8

**B.      The Arbitration Agreement Applies to All of Reulbach's Claims, Not Just Wrongful Discharge.**

Reulbach's assertion that his "claims that accrued prior to June 2019 could not possibly be subject to arbitration" based on certain language within the arbitration agreement is incorrect. The agreement is broad in scope, stating:

> Any "Covered Claims" that arise between team members and Life Time and its parents, subsidiaries, affiliates, their current or former officers, directors, employees, agents, and/or successors and assigns (collectively also referred to as "Life Time"), will be submitted to and determined exclusively by binding arbitration in accordance with the Federal Arbitration Act. "Covered Claims" are those brought under any statute, regulation, law, local ordinance, contract, covenant (express or implied), or common law relating to employment with Life Time, including but not limited to those concerning employee benefit plans, compensation, discrimination, harassment, retaliation, recovery of bonus, tuition reimbursement or relocation benefits, leave of absence, disability or other accommodation, or termination of employment.

Doc 6-2, p. 21. "Where, as here, an arbitration clause is broadly written, only an express provision excluding a specific dispute, or the most forceful evidence of a purpose to exclude the claim from arbitration, will remove the dispute from consideration by the arbitrators." *Watson Wyatt & Co. v. SBC Holdings, Inc.*, 513 F.3d 646, 650 (6th Cir. 2008) (internal quotations omitted). The agreement contains no "express provision" excluding any specific disputes at issue in this action, nor can Reulbach point to any "forceful evidence of a purpose to exclude" any of his claims from arbitration.

Instead, Reulbach focuses on the arbitration agreement's inclusion of the word "arise," citing *Russell v. Citigroup, Inc.*, 748 F.3d 677, 679 (6th Cir. 2014), to support the proposition that "[t]he use of the present-tense 'arise,' rather than the past-tense 'arose' or present-perfect 'have arisen,' suggests that the contract governs only disputes that begin—that arise—in the present or future." But Reulbach's reliance on *Russell* is misplaced. As another Sixth Circuit district court

9

determined based on facts and arguments nearly identical to those at issue here, *Russell* is easily distinguishable based on the simple fact that it involved the applicability of an arbitration agreement to a lawsuit already in progress.

Relying on *Russell*, the plaintiff in *Hammond v. Floor & Decor Outlets of Am., Inc.*, No. 3:19-cv-01099, 2020 U.S. Dist. LEXIS 205246, at *40-41 (M.D. Tenn. Nov. 3, 2020), challenged an arbitration agreement that covered "*any dispute* between [the employee and employer] that *may arise* from or in connection with" the employee's employment, or termination of that employment, with the employer (emphasis in original). Rejecting the plaintiff's arguments, the *Hammond* court explained that, though similar language existed in the arbitration agreement before it "indicat[ing] that it, too, is meant to apply to *disputes* that 'may arise' in the future—after its execution," *Russell* "did not address the distinction between the accrual of a cause of action and the existence of a dispute." *Id*. at *44. Instead, *Russell*:

> [A]ddressed the fact of an already existing lawsuit—which unambiguously qualifies as a "dispute"—and concluded that, however broadly construed, the arbitration agreement in that case could not be read to cover a lawsuit that was already proceeding in court at the time of the agreement's formation. In this case, conversely, when Cardona electronically signed the arbitration agreement in September 2018, no dispute had arisen and no lawsuit was underway. The earliest date upon which a dispute could have arisen would have been the day Cardona gave notice to F&D that he believed it was violating, or had violated, the FLSA. This apparently occurred when he opted into this lawsuit on May 26, 2020. Cardona does not contend that he had already provided F&D notice of, or that he was even aware of, an existing dispute at the time he signed the agreement.

*Id*. at *44-45. "In short," the *Hammond* court held, the arbitration agreement before it applied "to causes of action that had accrued, but had not yet ripened into disputes, as of the date Cardona entered into the agreement." *Id*. at *45.

Similar to *Hammond*, and unlike *Russell*, Defendants in this case do not seek to apply the arbitration agreement at issue to a previously-initiated lawsuit. Like in *Hammond*, at the time

10

Reulbach bound himself to the arbitration agreement, no dispute had arisen and no lawsuit was underway—Reulbach had not yet "brought" a "Covered Claim," regardless of whether any of his causes of action had "accrued."[8]

Additionally, courts in this circuit routinely reject arguments based on the "tense" of the language in otherwise broadly-written arbitration agreements. For example, in *Colley v. Scherzinger Corp.*, No. 1:15-cv-720, 2016 U.S. Dist. LEXIS 68574, at *20-21 (S.D. Ohio May 25, 2016), the plaintiff contended that an arbitration agreement failed to expressly state that it applied to any claims that accrued before the date on which the parties executed the agreement because the agreement used expressly present tense language. In rejecting the plaintiff's contention, the court focused on the parties' intent, noting the plaintiff "adopted the arbitration policy with the clear intent that it apply to all employees' problems and complaints." *Id*. at *21-22. Reiterating that "[a]greements to arbitrate disputes must be read broadly, and any doubts must be resolved in favor of arbitration," the court held that, "[w]hile the policy is written in present tense language, that alone is not sufficient to suggest that it creates a demarcation in the treatment of employees whose complaints are based on events that may have occurred prior to [its date of execution]." *Id*. at *21. Similarly, in this case, Reulbach has provided no evidence that the parties to the arbitration agreement intended to exclude causes of action based on events occurring before its implementation. That the agreement may contain present or future tense language does not compel a contrary finding.

---

[8] Additionally, in a section entitled "Claims Not Covered by this Agreement," Reulbach's arbitration agreement explicitly excludes disputes already in progress, expressly identifying "claims asserted by an [sic] team member in an action to which the team member was a party if that action was commenced or the team member became a party to that action before Life Time and the team member entered into this Agreement." Doc. 6-2, p. 21.

11

## **CONCLUSION**

For the reasons set forth above and in Defendants' Motion , Defendants respectfully request this Court enter an order compelling individual arbitration of Reulbach's individual claims, staying this lawsuit pending the outcome of arbitration, and ordering Reulbach pay Defendants' costs and fees for preparing its Motion and this reply.

Dated: June 10, 2021

Respectfully submitted,

**JACKSON LEWIS, P.C.**

*/s/ Robert J. Bowes, III*
Robert J. Bowes, III (0092871)
Park Center Plaza I, Ste. 400
6100 Oak Tree Boulevard
Cleveland, OH 44131
(216) 750-0404; (216) 750-0826 (Fax)
Robert.Bowes@jacksonlewis.com

Eric R. Magnus (*to be admitted Pro Hac Vice*)
171 17th Street, NW. Suite 1200
Atlanta, GA 30363
(404) 525-8200; (404) 525-1173 (Fax)
Eric.Magnus@jacksonlewis.com

*Attorneys for Defendants*

4837-9737-3166, v. 5